UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

BYRON WELLS, personal representative
of the estate of RONALD WELLS, deceased,

       Plaintiff,

                                           Case No. 1:08-CV-113

v.
                                           HON. GORDON J. QUIST

BARBARA MULNIX, RN, LOUANNE
BIEDRYCKI, RN, DAVID A. DEGRAAF,
ANTHONY J. CROLL, RN, and TRACEY
A. SHAFER, NP, jointly and severally,

       Defendants.

_____/

**<u>MEMORANDUM OPINION AND ORDER</u>**

**I. Introduction**

      Ronald Wells ("Wells"), an inmate at the Riverside Correctional Facility in Ionia County, Michigan, died after experiencing cardiopulmonary arrest.  Plaintiff Byron Wells, personal representative of Wells's estate, filed suit pursuant to 42 U.S.C. § 1983 against Barbara Mulnix, RN, Louanne Biedrycki, RN, David A. DeGraaf, Anthony J. Croll, RN, and Tracey A. Shafer, NP, alleging deliberate indifference to Wells' serious medical needs in violation of the Eighth Amendment.  Defendant Shafer has been dismissed from the case.  The remaining Defendants filed a Motion for Summary Judgment Raising the Issue of Qualified Immunity.  For the following reasons, the Court will grant Defendants' motion with respect to Mulnix.  It will deny Defendants' motion with respect to the other Defendants.

**II.  Facts**

On August 5, 2005, Wells presented to Mulnix complaining of tightness in his chest when walking long distances and dyspnea.  (Defs.' Br. at 1.)  Wells was 6 feet, 3 inches tall, weighed 301 pounds, and smoked approximately ten cigarettes per day.  At his initial examination by Mulnix, Wells's blood pressure was 135/92, his temperature was 97.6°, his pulse was 116, and his respiratory rate was 16 breaths per minute.  His pulse oxygen saturation ($SpO_2$) was 89%, his lung sounds were greatly diminished with faint rales, and his peak expiratory flow rate (PEFR) was 441 L/min.  Mulnix noted that Wells's nail beds were slightly cyanotic.  After Mulnix examined Wells, she referred him to Diana Marble, a nurse practitioner (NP).  (Defs.' Br. at 1.)

Marble, who is not a defendant in this case, noted that Wells presented with tachycardia (rapid heartbeat) and dyspnea.  She tentatively diagnosed Wells with pneumonia and prescribed antibiotics and breathing treatments with atrovent and albuterol inhalers.  (*Id.*)  After treatment with the inhalers, his average PEFR was 477 and his $SpO_2$ was 94% – 97%.  His lung sounds had improved "with better air exchange . . . [and] some faint rales."  (Docket no. 27-3 at 3.)  Marble ordered a chest x-ray stat to confirm the diagnosis.  It was taken within an hour of Wells's initial examination.  However, the record reveals that the x-ray was either never read, or if it was read, the results were never communicated to anyone treating Wells.

On August 5, 2005, Mulnix examined Wells again at 2:24 p.m. and demonstrated the use of the inhalers.  Wells indicated he felt better than he had earlier that day.  (Defs.' Br. at 1-2.)  His blood pressure was 137/89, his temperature was 99.3°, his pulse was 116, and his respiratory rate was 20 breaths per minute.  His $SpO_2$ was 94%, his lung sounds revealed improved air flow with scattered rales, and his PEFR was 400 L/min.  On August 6, 2005, Wells met with Biedrycki and told

2

her he was still not feeling well.  (Docket no. 35-8 at 3).  His blood pressure was 141/92, his temperature was 98.9°, his pulse was 109, and his respiratory rate was 16 breaths per minute.  His $SpO_2$ was 94% - 97%, his lung sounds were greatly diminished, and his PEFR was 377.

Wells met with DeGraaf on August 7, 2005.  DeGraff noted that Wells said he was feeling better, though the walk to the clinic made him short of breath.  (Docket no. 35-8 at 4).  His blood pressure was 130/90, his temperature was 98.0°, his pulse was 100, and his respiratory rate was 16 breaths per minute.  His $SpO_2$ was 98%, his lung sounds were clear with a mild wheeze, and his PEFR was 350 L/min.  On August 8, 2005, Wells met with Croll.  His blood pressure was 131/92, his temperature was 97.1, his pulse was 114, and his respiratory rate was 16 breaths per minute.  His $SpO_2$ was 95%, his lung sounds were "clear to auscultation except for [the] extreme l[ef]t base", and his PEFR was D.  (Docket no. 35-8 at 5).  Croll determined no further immediate care was necessary. (Defs.' Br. at 3.)

Biedrycki and DeGraaf responded to an emergency call the evening of August 8, 2005.  Wells was found "agitated and thrashing around" before the prison staff placed him on the hallway floor. (*Id.*)  Wells stopped breathing and CPR was administered.  (*Id.*)  Attempts to resuscitate Wells failed and he was pronounced dead.  An autopsy revealed that Wells died from massive pulmonary emboli most likely originating in the lower extremities.  (*Id.*)

## III.    Analysis

### A.    Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56.  A material fact is defined by substantive law and is necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248, 106 S. Ct. 2505, 2510 (1986).  A genuine issue of fact exists if a reasonable jury could find for the non-moving party.  *Id.*  The Court must draw all inferences in the light most favorable to the non-moving party.  However, a mere "scintilla of evidence in support of the [moving party's] position" is insufficient.  *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512.

### B.    Qualified Immunity

Defendants contend they are not subject to suit for damages in their individual capacities because they have qualified immunity.  "'Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)).  The Court examines qualified immunity claims by determining whether: 1) a constitutional violation occurred; 2) the right was a clearly established one of which a reasonable person would have known; and 3) the officials' alleged acts were objectively unreasonable.  *Short v. Oaks*, 129 F. App'x 278, 284 (6th Cir. 2005).

### C.    Eighth Amendment Violation

The Eighth Amendment prohibits prison officials from acting with deliberate indifference to prisoners' serious medical needs.  *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002).  A serious medical need is one a physician has diagnosed as requiring treatment, or one "that is so obvious . . . a lay person would easily recognize" that it requires a doctor's attention.  *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (internal quotations omitted).  "Negligen[ce] in diagnosing or treating a medical condition" is insufficient to state a claim of deliberate indifference.  *Terrance*, 286 F.3d at 843.  To establish liability, a prison official must be

4

"aware of facts from which" he could infer "that a substantial risk of serious harm exists, and he must . . . draw th[at] inference." *Id.*

However, one need not show "that a prison official acted or failed to act believing" harm would actually befall the inmate. *Id.* Knowledge of a substantial risk suffices. Whether an official had such knowledge may be "'infer[red] from circumstantial evidence.'" Furthermore, one may determine an official knew of the risk "'from the very fact that [it] was obvious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1981 (1994)). The misconduct need not be flagrant to establish liability. The "'decision to take an easier but less efficacious course of treatment'" may suffice as well as "'grossly inadequate care.'" *Id.* (quoting *McElliot v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). Finally, "'medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.'" *Id.* (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11 th Cir. 1989) (physician's assistant's failure to inform a medical doctor of prisoner's known injured leg is deliberate indifference)).

### 1.     Judicial Notice of the Merck Manual

On January 29, 2009, the Court informed the parties of its intent to take judicial notice of the Professional and Home editions of the Merck Manual in its analysis of the Defendants' instant motion for summary judgment. Defendants objected on several grounds. Foremost among them was their concern that the Court might attempt to use the Merck Manual to establish the standard of care by which the treatment provided Wells should be measured. They also contended that it was improper to take judicial notice of the Merck Manual because the veracity of its contents are subject to reasonable dispute. The Court notes that the standard of care is irrelevant because Plaintiff alleges

5

deliberate indifference, not malpractice.  Accordingly, the Court is not using the Merck Manual to establish the standard of care, nor has it considered the standard of care in its analysis.

The Court does not agree that the information it has gleaned from the Merck Manual is subject to reasonable debate.  Defendants have not challenged any of the facts upon which the Court relies.  They have argued that Wells was at lower risk for pulmonary embolism than pneumonia. They suggested that reliance on the Merck Manual might lead the Court to overestimate the probability of pulmonary embolism relative to the likelihood of pneumonia in a patient similar to Wells.  This argument is irrelevant because the Court does not use the Merck Manual to establish the likelihood that a patient like Wells would suffer from pulmonary embolism, nor does it consider this probability in its analysis.  It will be apparent below that the Court has relied on the Merck Manual only to determine whether a reasonable jury could conclude, in light of Defendants' training and the facts alleged by Plaintiff, that Defendants knew of and disregarded a substantial risk that Wells suffered from a serious respiratory illness other than pneumonia.

**2.      Was There a Constitutional Violation?**

This is a difficult case.  The record reflects that the Defendants were subjectively aware that Wells required medical treatment.  They treated him for four days before he experienced cardiac arrest and died.  However, the misdiagnosis of pneumonia and consequent failure to diagnose Wells's pulmonary embolism led directly to his untimely death.  Mere misdiagnosis is insufficient to establish liability, even when it leads to the inmate's death.  Defendants argue they treated Wells appropriately given that they believed he had pneumonia.  The question is *not* whether Defendants should have suspected Wells had a pulmonary embolism, nor whether Defendants *actually* suspected he may have been suffering from a pulmonary embolism, only to disregard their suspicion.  The

question, in this Court's analysis, is whether Defendants' knew of and disregarded a substantial risk that the serious medical problem afflicting Wells was something other than pneumonia. The Court concludes there is sufficient evidence to show that they did.

Pulmonary embolism is not an uncommon medical problem. "About 1% of people admitted to the hospital have a pulmonary embolism. . . . [P]ulmonary embolism is unexpectedly found to be the cause" of death in "about 5% of people" who have an autopsy. Merck Manual Home Edition: Pulmonary Embolism, http://www.merck.com/mmhe/sec04/ch046/ch046a.html (last visited Jan. 3, 2009). *See also* Merck Manual Professional: Pulmonary Embolism (PE): Pulmonary Disorders, http://www.merck.com/mmpe/sec05/ch050/ch050a.html (last visited Jan. 3, 2009) (noting that there are approximately 350,000 cases of pulmonary embolism each year, and that pulmonary embolism kills up to 85,000 people annually). However, diagnosing a pulmonary embolism "is challenging, because symptoms . . . are nonspecific and diagnostic tests are either imperfect or invasive." Merck Manual Professional: Pulmonary Embolism, *supra*. Because both pulmonary embolism and pneumonia exhibit nonspecific symptoms that can mimic those presented by other respiratory illnesses, pulmonary embolism "should be considered in the differential diagnosis of patients suspected of having . . . pneumonia." Merck Manual Professional: Pulmonary Embolism, *supra*. Furthermore, the Merck Manual warns in its discussion of pneumonia that pulmonary embolism is "the most serious condition misdiagnosed as pneumonia." Merck Manual Professional: Pneumonia, http://www.merck.com/mmpe/sec05/ch052/ch052b.html (last visited Jan. 3, 2009).

The first question before the Court, although not raised by the parties, is whether it is appropriate for the Court to take judicial notice of the Merck Manual on its own motion. The Court concludes for the following reasons that it is.

In analyzing a motion for summary judgment, the court "may consider pleadings, depositions, answers to interrogatories, admissions on file, affidavits, oral testimony, *matters subject to judicial notice*, stipulations and concessions, and other materials admissible in evidence or otherwise usable at trial." *Harris v. H & W Contracting Co.*, 102 F.3d 516, 522 (6th Cir. 1996) (emphasis in original) (internal quotations omitted). Courts have noted that the "Merck Manual is a commonly used medical reference text." *Galle v. Ingalls Shipbuilding, Inc.*, No. 98-60291, 2000 WL 634630 at *3 (5th Cir. May 4, 2000). In *Harris*, the court took judicial notice of the symptoms of Graves' disease described in the Merck Manual. In *Galle*, the court held that it was appropriate for the Administrative Law Judge to take judicial notice of the Merck Manual in a death benefits case because the plaintiff received notice that the ALJ was doing so and was given an opportunity to contest the "portions [of the Manual] on which the ALJ relied." *Id.* Finally, in *Hatlestad v. Brown*, 5 Vet. App. 524, 531 (1993), the court noted that the Board of Veterans Appeals could "draw guidance from a great diversity of medical treatises" provided that it gave the plaintiff notice and an opportunity to respond. In accordance with these decisions, this Court concludes it may take judicial notice of the Merck Manual.

A diagnosis of pneumonia is "suspected on the basis of clinical presentation and is confirmed by chest x-ray." Merck Manual Professional: Pneumonia, *supra*. The Court finds that a rational jury could conclude that Defendants knew, as a result of their medical training, that Marble's tentative diagnosis of pneumonia could not be confirmed until Wells's chest x-ray was read. The critical question in the case is whether the x-ray had been read and the results communicated to the staff. If a rational jury could conclude Defendants knew it was not, that jury could also conclude

Defendants knew, as a result of their medical training, that there was a substantial risk that Wells was suffering from a serious respiratory disorder other than pneumonia.

Plaintiff contends the x-ray was never read. (Pl.'s Resp. in Opposition to Defs.' Mot. for Summ. J. on the Issue of Qualified Immunity at 8, (docket no. 35 at 8).) Defendants do not challenge this contention directly. Instead, they argue that they did not "read or follow up on the chest x-ray because that is not part of a nurse's job duties." (Defs.' Br. in Supp. of Mot. for Summ. J. Raising the Issue of Qualified Immunity at 1, (docket no. 27 at 5).) Plaintiff's experts stated that they read Wells's medical records and that Defendants "fail[ed] to follow up on the results of the stat chest x-ray." (Peterson Aff. at 2, (docket no. 35-11 at 2).) As Defendants have presented no contrary evidence, this evidence is sufficient to permit a rational jury to conclude the x-ray was either never read, or if it was, the results were not communicated to Wells's caregivers.

However, liability will not attach unless Defendants also knew that the x-ray had not been read, or that if it had, the results had not been communicated. The Court concludes there is sufficient evidence to permit a rational jury to find that Defendants Biedrycki, DeGraff, and Croll knew this. However, a rational jury could not conclude Defendant Mulnix knew this. Mulnix examined Wells the morning of August 5, 2005, and again that afternoon. The x-rays were taken shortly after she first examined Wells. The results of the x-ray would not have been available when she saw Wells again later that afternoon. Mulnix knew this and did not expect them. She did not examine Wells again after his second visit on August 5, 2005.

Biedrycki, DeGraff and Croll saw Wells in the days following his initial examination. Biedrycki examined Wells at 10:52 a.m. on Saturday, August 6, 2005. DeGraff examined him at 3:04 p.m. on Sunday, August 7, 2005. Croll saw Wells at 9:03 a.m. on Monday, August 8, 2005.

Wells died at approximately 7:12 p.m. on Monday.  When Biedrycki, DeGraff and Croll saw Wells on Saturday, Sunday and Monday, respectively, they had his medical chart.  Defendants have not argued they were unaware that the x-ray had not been read.  Instead, they argue that they did not follow up on the results because it was not their job to do so.  A rational jury could conclude they knew the x-ray had not been read and understood the associated risk, yet chose to do nothing.

In summary, the Court finds there is sufficient evidence at this juncture to permit a rational jury to determine that: 1) Defendants knew, as a result of their medical training, that Wells's diagnosis could not be confirmed without the results of the x-ray; 2)  Defendants Biedrycki, DeGraff and Croll knew that the x-ray had either not been read, or if it was read, that the results of the x-ray had not been entered into Wells's medical chart and communicated to his caregivers; 3) consequently, Defendants Biedrycki, DeGraff and Croll knew there was a substantial risk Plaintiff was not suffering from pneumonia, but some other respiratory illness; and 4) Defendants Biedrycki, DeGraff and Croll disregarded this risk by failing to inform their superiors that the x-ray results had not been obtained by these Defendants, who were the only medical caregivers with whom Wells interacted.  There is thus sufficient evidence to permit a rational jury to find that Defendants Biedrycki, DeGraff and Croll were deliberately indifferent to Wells's serious medical needs.  Accordingly, whether Biedrycki, DeGraff and Croll violated Wells's Eighth Amendment rights is a triable issue of fact.

### 3.      Was This a Clearly Established Right?

The constitutional prohibition against deliberate indifference to a prisoner's serious medical needs is clearly established.  A reasonable health care provider would be apprised of this right.

### 4.      Was the Defendants' Conduct Objectively Unreasonable?

Taking all allegations and reasonable inferences in the light most favorable to Plaintiff, the Court determines that a reasonable jury could find Defendants' conduct objectively unreasonable. Drawing all inferences in favor of the non-moving party, Defendants Biedrycki, DeGraff and Croll knew there was a substantial risk that Wells suffered not from pneumonia, but some other respiratory disorder. However, for one reason or another, they chose not to inform Marble or anyone else responsible for diagnosing Wells that the x-ray had not been read, or if it had, that the results had not been communicated. Instead, they remained silent while they continued a course of treatment predicated entirely upon a diagnosis of pneumonia that they knew remained unconfirmed. Defendants Biedrycki, DeGraff and Croll were not responsible for diagnosing Wells or prescribing his course of treatment. However, they were the health care providers Wells saw daily in the four days preceding his death. They were responsible for monitoring Wells's condition and informing the medical decision-makers of any relevant information they knew might bear on his diagnosis or treatment. The relevant information in this case was that Wells's diagnosis remained unconfirmed because the x-ray had not been read, and the accompanying knowledge that so long as it remained unconfirmed, there was a substantial risk that Wells was suffering from some other undiagnosed respiratory illness. Their decision to remain silent despite this knowledge was unreasonable, constituted deliberate indifference to Wells's serious medical needs, and ultimately foreclosed the possibility of diagnosing the pulmonary embolism that killed Wells.

Defendants have argued that they believed Wells's condition was improving and were thus unaware he was in acute distress. DeGraff states that he regarded Wells's PEFR of 350 L/min on August 7, 2005, as "within the range of normal variation for a smoker with [a] suspected respiratory infection and certainly normal for a mentally ill patient who smoked and did not exercise." (DeGraff

11

Aff. at 2, (docket no. 36-2 at 2.).)   The Defendants have also noted that Wells's SpO$_2$ had significantly improved and were normal when DeGraff examined him on August 7, 2005.  The Court believes that whether Wells's appeared to be improving is a matter of debate.  Although his SpO$_2$ improved considerably, the Court questions whether much can be drawn from that fact.  Treatment with the inhalers markedly improved his SpO$_2$ but obviously did not, and was not intended to, remedy his suspected or actual underlying pathology.  And while it was reasonable to evaluate Wells's PEFR in light of his suspected pneumonia, smoking and sedentary lifestyle, the Court doubts one can regard a PEFR that declined from 400 L/min on August 5 to 350 L/min on August 7 as a sign of improvement.  Whether Defendants believed Wells was improving, however, is less relevant than the fact that they knew his x-ray had not been read and that the pneumonia diagnosis remained unconfirmed, exposing Wells to the substantial risk that he suffered from some other, unknown respiratory disorder.

One might argue that whether Defendants believed Wells was improving is relevant to whether they perceived the risk that he might be suffering from some other serious respiratory illness.  Assuming, *arguendo*, that is true, the Court determines that whether Defendants believed Wells was improving, and whether that belief blinded them to the risk, are questions a reasonable jury could answer in Plaintiff's favor.

## IV. Conclusion

Plaintiff has presented sufficient evidence to permit a rational jury to determine that Defendants Biedrycki, DeGraff and Croll knew that Wells's pneumonia diagnosis could not be confirmed until it was read, that his chest x-ray had not been read, and consequently that there was a substantial risk that Wells suffered not from pneumonia, but some other serious respiratory

disorder.  Their decision to remain silent in light of this knowledge constituted deliberate indifference and violated Wells's Eighth Amendment rights.  A prisoner's Eighth Amendment rights are clearly established and would be understood by a reasonable health care provider.  Under the circumstances, a reasonable health care provider would have informed his superiors that the x-ray had not been read.  For the foregoing reasons, Defendants Biedrycki, DeGraff and Croll are not entitled to qualified immunity.  Defendant Mulnix, however, is so entitled, because a rational jury could not conclude she knew Wells's x-ray had not been read.

Therefore,

**IT IS HEREBY ORDERED** that  Defendants' Motion for Summary Judgment (docket no. 26) is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (docket no. 26) is **GRANTED** with respect to Defendant Mulnix.  Defendant Mulnix is **DISMISSED** from the case.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (docket no. 26) is **DENIED** with respect to the remaining Defendants.


Dated:  March 30, 2009                              _____/s/ Gordon J. Quist_____
                                                                          GORDON J. QUIST
                                                                 UNITED STATES DISTRICT JUDGE